UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| PHYLLIS J. SULT, | ) |
|     Plaintiff, | ) ) ) |
| v. | )   CIVIL NO. 3:06cv526 |
| MICHAEL J. ASTRUE[1], Commissioner of Social Security, | ) ) ) ) |
|     Defendant. | ) |

<u>OPINION AND ORDER</u>

This matter is before the court for judicial review of a final decision of the defendant Commissioner of Social Security Administration denying plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) as provided for in the Social Security Act. 42 U.S.C. §416(I); 42 U.S.C. §423; 42 U.S.C. §§ 1382, 1382c(a)(3). Section 205(g) of the Act provides, <u>inter alia</u>, "[a]s part of his answer, the [Commissioner] shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based. The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the case for a rehearing." It also provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. §405(g).

The law provides that an applicant for disability insurance benefits must establish an

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. In accordance with Fed. R.Civ. P. 25(d)(1) and the last sentence of 42 U.S.C. § 405(g), Michael J. Astrue is, therefore, automatically substituted as the Defendant in this civil action, and no further action is necessary to continue this case.

"inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months. . . ."  42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §423(d)(3).  It is not enough for plaintiff to establish that an impairment exists.  It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity.  Gotshaw v. Ribicoff, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); Garcia v. Califano, 463 F.Supp. 1098 (N.D.Ill. 1979).  It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff.  See Jeralds v. Richardson, 445 F.2d 36 (7th Cir. 1971); Kutchman v. Cohen, 425 F.2d 20 (7th Cir. 1970).

   Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings."  Garfield v. Schweiker, 732 F.2d 605, 607 (7th Cir. 1984) citing Whitney v. Schweiker, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g).  "Substantial evidence is defined as 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Rhoderick v. Heckler, 737 F.2d 714, 715 (7th Cir. 1984) quoting Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); see Allen v. Weinberger, 552 F.2d 781, 784 (7th Cir. 1977).  "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law."  Garfield, supra at 607; see also Schnoll v. Harris, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after consideration of the entire record, the Administrative Law Judge ("ALJ") made the following findings:

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant's status-post multi-level cervical laminectomy surgery, status-post laryngeal polyp removal, status-post myocardial infarction (1996), degenerative disc disease of the lumbar and cervical spine and peripheral vascular disease with claudication are, in combination, considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(c)

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6. The claimant retains the residual functional capacity to perform light work as defined in 20 CFR § 404.1567 that involves no climbing of ladders, ropes or scaffolds, only occasional (less than one third of the workday) climbing of ramps and stairs and only occasional balancing, stooping, kneeling, crouching and crawling.

7. The claimant's past relevant work as a waitress did not require the performance of work-related activities precluded by her residual functional capacity (20 CFR § 404.1565).

8. The claimant's medically determinable impairments do not prevent the claimant from performing her past relevant work as a waitress.

9. The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR § 404.1520(f)).

(Tr. 22-23).

Based upon these findings, the ALJ determined that the plaintiff was not entitled to disability

3

insurance benefits. The ALJ's decision became the final agency decision when the Appeals Council denied review.  This appeal followed.

The plaintiff filed her opening brief on January 22, 2007.  On  March 6, 2007, the defendant filed a memorandum in support of the Commissioner's decision, and on March 30, 2007, the plaintiff filed her reply.  Upon full review of the record in this cause, this court is of the view that the ALJ's decision should be reversed.

A five step test has been established to determine whether a claimant is disabled.  See Singleton v. Bowen, 841 F.2d 710, 711 (7th Cir. 1988); Bowen v. Yuckert, 107 S.Ct. 2287, 2290-91 (1987).  The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order:  (1)  Is the claimant presently unemployed?  (2)  Is the claimant's impairment "severe"?  (3)  Does the impairment meet or exceed one of a list of specific impairments?  (4)  Is the claimant unable to perform his or her former occupation?  (5)  Is the claimant unable to perform any other work within the economy?  An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled.  A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

Nelson v. Bowen, 855 F.2d 503, 504 n.2 (7th Cir. 1988); Zalewski v. Heckler, 760 F.2d 160, 162 n.2 (7th Cir. 1985); accord Halvorsen v. Heckler, 743 F.2d 1221 (7th Cir. 1984).  From the nature of the ALJ's decision to deny benefits, it is clear that step four was the determinative inquiry.

In November 2002, the plaintiff filed an application for Disability Insurance Benefits (DIB) under the Social Security Act (the Act), 42 U.S.C. §§ 416(I), 423, alleging that her disability began in July 2002 (Tr. 43).  Her application was denied initially and on

4

reconsideration . On February 24, 2005, the plaintiff testified at a hearing before Administrative Law Judge (ALJ) Frederick McGrath . On September 6, 2005, the ALJ denied the plaintiff's disability claim in a written decision, finding that the plaintiff had severe impairments but that she could perform her past work as a waitress, and was therefore "not disabled" within the meaning of the Act .  The Appeals Council denied the plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner, and the plaintiff is now before the Court for judicial review of this final decision under 42 U.S.C. § 405(g) (Tr. 4).

The plaintiff was 56 years old at the time of the ALJ's decision, and had completed high school. Tr. 46, 61. She last worked in July 2002 as a waitress, and alleged that she became disabled at that time. Tr. 46, 56. The plaintiff testified that she was unable to work due to pain in her neck, back and feet. Tr. 255. Her activities included making her bed with difficulty, playing with her dog, watching television, reading, fixing lunch, doing dishes (with difficulty), performing household cleaning, performing grocery shopping with assistance, doing laundry with assistance and doing some driving. Tr. 259-62. The plaintiff's daughter also testified, and stated that the plaintiff was understating her difficulties. Tr. 264-66.

In September 2001, due to complaints of leg pain when walking (claudication), the plaintiff underwent an abdominal aortogram with bilateral lower extremity run-off. Tr. 90. The testing showed moderate to severe vessel disease in the right hip artery, the right femoral artery, the right and left calves, and the back side of the left knee.

In July 2002, Dr. Langheinrich, a neurosurgeon, diagnosed the plaintiff with severe spastic quadriparesis (multi-extremity muscle weakness) secondary to spinal narrowing in her neck. Tr. 201. Dr. Langheinrich recommended neck surgery.

5

In August 2002, the plaintiff underwent neck surgery. Tr. 115. Dr. Langheinrich noted that the plaintiff's spastic quadriparesis had improved and her urinary function had improved, but noted that the plaintiff probably would not improve completely because she had evidence of spinal cord damage pre-operatively. Tr. 199.

The plaintiff then underwent inpatient rehabilitation. Tr. 117. Upon admission to rehabilitation, the plaintiff was evaluated by Dr. Desmarais, a physician. Tr. 120-22. The plaintiff reported to Dr. Desmarais that her hand strength had improved, and numbness/tingling had improved also, but that she still had difficulty walking and had stress incontinence. Tr. 121. Dr. Desmarais's impression was myopathy and spastic paraparesis, hypergenicity (excessive growth) of the legs, and decreased mobility in activities of daily living. Tr. 122. Upon discharge from rehabilitation, the plaintiff was evaluated by Dr. Markley, a physician. Tr. 117-19. Dr. Markley reported that the plaintiff was at a modified-independent level for walking and activities of daily living; Dr. Markley stated that the plaintiff had some spasticity that was treated with medication; and Dr. Markley stated that the plaintiff was stable upon discharge. Tr. 117-18.

In September 2002, Dr. Markley saw the plaintiff again. Tr. 157. Dr. Markley reported that medication was controlling the plaintiff's spasticity, and that she complained of restless leg syndrome at night. Dr. Markley recommended that the plaintiff wear her cervical collar at all times and observe a 10-pound lifting restriction. Tr. 158. In September 2002, the plaintiff also completed a course of out-patient physical therapy. Tr.160.

In October 2002, Dr. Langheinrich noted that the plaintiff still had spastic paraparesis which had improved since the neck surgery. Tr. 199. The plaintiff's gait was stiffening, so Dr.

6

Langheinrich advised an increase in the plaintiff's medication. Dr. Langheinrich stated that he would see the plaintiff in three months, and that she could attempt to return to work as a waitress.
But, he also added that, if the plaintiff could not tolerate this, he would support her application for disability since she still had evidence of cord damage.

In January 2003, Dr. Barbour, a physician, performed a consultative examination. Tr. 175-76. Dr. Barbour found that the plaintiff had a moderate-to-severe ataxic gait, but had normal strength in all areas, normal reflexes, normal sensation, normal grip strength, normal fine finger manipulation, and largely normal ranges of motion. Dr. Barbour's impressions were: that the plaintiff continued to have a great deal of problems (pain and muscle spasms) related to her neck condition that interfered with daily activities; that the plaintiff had left shoulder pain of unknown cause; that the plaintiff had possible bilateral carpal tunnel syndrome; and that the plaintiff had peripheral vascular disease that caused leg pain and interfered with daily activities. Tr. 176.

In March 2003, the plaintiff underwent doppler exercise testing, but had to stop the test because of severe leg pain. Tr. 178. In March 2003, and again in August 2003, State Agency Medical Consultants reviewed the evidence of record, including the recent doppler testing, and concluded that the plaintiff could perform light work. Tr. 179-90.

In April 2003, Dr. Langheinrich reported that the plaintiff still had significant chronic myelopathy with spastic paraparesis, but that her hand function had improved. Tr. 195. Dr. Langheinrich also noted that the plaintiff continued to need medication for her spasms.
In September 2003, Dr. Langheinrich stated that the plaintiff had chronic spinal cord

7

pathology with chronic spastic quadriparesis, and that the plaintiff was disabled and had great difficulty with walking or standing. Tr. 230.

Later in September 2003, the plaintiff had EMG testing of her arms due to complaints of numbness. Tr. 237. The testing was within normal limits and "specifically did not reveal evidence for a peripheral neuropathic process nor for a carpal tunnel syndrome bilaterally, nor evidence for active right cervical radiculopathy, all this despite her history." Tr. 237.
In October 2003, Dr Langheinrich stated that the plaintiff obtained some improvement with decompression surgery, but still has significant myelopathy with spasms, clonus, and spastic gait.
Tr. 228. Dr. Langheinrich opined that the plaintiff was disabled due to evidence of spinal cord damage, despite the normal EMG.

In April 2004, Dr. Langheinrich stated that the plaintiff still had residual spastic quadriparesis and evidence of myelopathy. Tr. 228. Dr. Langheinrich indicated that these conditions would be permanent, and supported her application for disability. In June 2004, Dr. Langheinrich stated that the plaintiff had chronic neck pain and weakness with spasms in all four extremities. Tr. 227. Dr. Langheinrich opined that the plaintiff had a 10- pound lifting limitation, but was disabled because she could not safely work in a standing or walking position. In October 2004, Dr. Langheinrich stated that the plaintiff's condition was unchanged, and continued to support her application for disability. Tr. 228.

The ALJ asked the vocational expert whether the plaintiff could perform any jobs if she were limited to light work, and the expert indicated that the plaintiff would be able to return to her past work as a waitress. Tr. 268-69.

8

The ALJ found that the plaintiff's assertion of disability was not credible and that she could perform the minimal demands of light work. Tr. 22. Based on this finding and the vocational expert's testimony, the ALJ further found that the plaintiff was capable of performing her past work as a waitress, and thus was not entitled to disability benefits. Tr. 22-23.

A claimant is considered disabled only if she demonstrates an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(a)(1), (d)(1)(A). The claimant must show that her physical or mental impairments "are of such severity that [she] is not only able to do [her] previous work . . . ." 42 U.S.C. § 423(d)(2)(A).

As noted above, the Agency applies the foregoing statutory standard by way of a five-step sequential analysis. 20 C.F.R. § 404.1520(a)(4). In the present case, only the plaintiff's credibility, functional capacity and step four are at issue. Credibility and functional capacity are determined prior to step four of the analysis. 20 C.F.R. § 404.1520(a)(4). At step four, these findings are considered together with the claimant's vocational profile to determine if she can perform her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If she can, she will be found not disabled. Id.

An ALJ's factual findings are conclusive if they are supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401(1971). This standard of review recognizes that it is the Agency's duty to weigh the evidence,

9

resolve material conflicts, make independent findings of fact, and decide questions of credibility. Id. at 399-400. The reviewing court must not reevaluate the facts, reweigh the evidence, or substitute its own judgment for that of the Agency.  Griffith v. Callahan, 138 F.3d 1150, 1152 (7th Cir. 1998).

If the Court were to determine that the ALJ's decision was not supported by substantial evidence, the Court reverses the decision with or without remand for further administrative proceedings. 42 U.S.C. § 405(g). The Court may immediately award benefits only if "the record can yield but one supportable conclusion," and there are no unresolved factual issues. Campbell v. Shalala, 988 F.2d 741, 744 (7th Cir. 1993).

The plaintiff argues that the ALJ failed to build an accurate and logical bridge between the evidence and his conclusion that the plaintiff could do light work.  The plaintiff asserts that the ALJ ignored all of the evidence that failed to support an assessment of light work.

When determining disability, the ALJ must clearly articulate his analysis of the evidence, building an accurate and logical bridge between the evidence and his conclusion. Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000). The ALJ does not need to address every document in the record, but he must not select only those documents for review that support his analysis. "His written decision should contain, and his ultimate determination must be based upon, all of the relevant evidence in the record." Garfield v. Schweiker, 732 F.2d 605, 609 (7th Cir. 1984). It is essential for meaningful review of his decision that the ALJ articulate reasons for crediting or rejecting evidence. Zblewski v. Schweiker, 732 F.2d 75, 78 (7th Cir. 1984). Decisions by administrative agencies cannot be upheld if "the reasons given by the trier of fact do not build a logical bridge between the evidence and the result." Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir.

1996) Although the ALJ has broad discretion in assessing the credibility of the claimant's statements, his "findings must be articulated to some degree in order to afford meaningful judicial review." Olson v. Apfel, 17 F. Supp. 2d 783, 791 (N.D. Ill. 1998)(citation omitted). "An ALJ must consider all of the evidence and discuss significant evidence contrary to her ruling." Lauer v. Apfel, 169 F.3d 489, 494 (7th Cir. 1999). "'An ALJ may not ignore an entire line of evidence that is contrary to her findings,' but rather she must 'articulate at some minimal level (her) analysis of the evidence' to permit informed review." Zurawski v. Halter, 245 F.3d 881, 888 (7th Cir. 2001), quoting Henderson v. Apfel, 179 F.3d 507, 514 (7th Cir. 1999).

> The ALJ determined the plaintiff could do light work.
>
> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. 1567(b)

The plaintiff contends that this finding ignores two significant lines of evidence that show she could not do a job requiring a good deal of walking or standing. First, the plaintiff had severe peripheral artery disease (Tr 91) The plaintiff had been complaining of pain in her legs for years. She stated on her application, "I started working part time at Bonnie Doon in 1997 due to problems with my heart and poor circulation in my legs." (Tr 48) The plaintiff testified, "I was like a disabled worker. And I kept my hours down because I couldn't do it anymore. (Tr 267) In 2000 and 2001 she did not even work at the level of substantial gainful activity, defined in 2000 as having earnings that averaged $700 per month and in 2001 as $740 per month. See, 20 C.F.R.

11

404.1574(b)(2) Table 1 (Earnings under $700 per month or $8400 annually in 2000 and $740 per month or $8880 annually in 2001 do not demonstrate substantial gainful activity). In 2001 she had an abdominal aortogram that showed severe problems with the circulation in her legs. (Tr 91) The plaintiff contends that she was not even demonstrating the ability to do the standing and walking required for a light job before she began to develop her symptoms serious enough to require a three level cervical fusion with instrumentation and bone grafting.

      The plaintiff further contends that the ALJ also ignored the clear evidence that she suffered from spastic quadraparesis, ataxia, and had clonus. The history before the cervical surgery included an increasing spastic gait (Tr 106) with frequent falls, (Tr 101) diagnosed as "severe spastic quadripareis". (Tr 201) After the surgery, her neurosurgeon was hopeful she might be able to return to work but noted, if she could not he would, "support her in an application for social security disability since she still has significant evidence of cord damage." (Tr 199) After the surgery, Paul Desmaris, M.D. noted difficulty walking with the objective sign of hypergenicity in the legs and stated that she still had spastic paraparesis and decreased mobility in activities of daily living. (Tr 122) The ALJ did not discuss this exhibit. Physical medicine specialist, Jon Markley, M.D. also noted that she still had spastic motor tone in both legs post surgery. (Tr 157) He gave her a ten-pound weight limit. (Tr 158) The ALJ noted the ten-pound limit, but nothing regarding her spastic muscle tone. (Tr. 18)

      The Agency sent the plaintiff to a consultative examination with Thomas Barbour, M.D. on January 6, 2003. Dr. Barbour, in the objective portion of his examination, made the following notations that were ignored by the ALJ:

> Well nourished female, who has a moderate to severe ataxic gait. She had
> moderate to severe difficulty getting off the exam table, due to her ataxic

12

difficulties. (Tr 175)

I could not feel the pulses in her feet or the popliteal region well at all. The popliteal region and feet registered pulsations of about 1-2/5 bilaterally. (Tr 176)

Nor did the ALJ discuss Dr. Barbour's impressions:

1. This patient has cervical stenosis and despite surgery, continues to have a great deal of problems that interfere with daily activities. Prognosis for further improvement is very poor. (Tr 176) …

3. Possible bilateral carpal tunnel syndrome…

4. Peripheral vascular disease with significant claudication. This problem also interferes with daily activities. (Tr 176)

This is what the ALJ's decision said of the exam with Dr. Barbour:

When she was examined by Dr. Barbour, she had normal range of motion and normal muscular strength and deep tendon reflexes throughout with the exception of a limited range of cervical motion. She had normal grip strength and fine finger manipulation. (Tr 20)

The ALJ also noted:

The opinions and findings of Dr. Barbour are generally accompanied by objective medical findings and a clear medical rationale, and are consistent with other evidence of record. However, his conclusion that the claimant might have carpal tunnel surgery are not well supported. (Tr 21)

Similarly the ALJ ignored core portions of the opinions of the plaintiff's primary physician, Walter Langheinrich, M.D. The plaintiff contends that the ALJ used a fallacious argument to dispense with Dr. Langheinrich's oft-repeated opinions regarding disability and functional limitations. The ALJ said:

The opinions of Dr. Langheinrich are given somewhat reduced weight in determining the claimant's functional capacity. While he did have the opportunity to see and treat the claimant over a long period of time and did perform surgery on her, his opinions that she was entirely disabled from (sic) full or part-time work are given no weight. Social Security Ruling 96-5p and 20 CFR 404.1527(e) provide that the ultimate determination of "disability" under the Social Security

>Act is reserved to the Social Security Commissioner and her delegees, and opinions by other persons are not entitled to controlling weight. (Tr 21)

It is true that Dr. Langheinrich stated on multiple occasions that the plaintiff was totally disabled, (See Tr 227, 228, 229, and 230) and the law cited by the ALJ reserves the ultimate determination of disability to the Commissioner. But just because the doctor opines a person is disabled is scarcely an appropriate reason to discount the rest of the doctor's opinion. Dr. Langheinrich also expressed functional limitations that the ALJ obviously did not consider in determining the plaintiff had the residual functional capacity to do the prolonged standing or walking required for light work. Dr. Langheinrich said "Her lifting restriction is less than ten pounds maximum. I do not feel she is safe working in a standing or walking position." (Tr 227) He also said, "She has a great deal of difficulty with walking and standing." (Tr 230) The ALJ ignored these statements.

If the plaintiff could not walk or stand most of the day, she could not do a light job. If she could not lift ten pounds she could not even do the full range of sedentary work, let alone a light job that requires lifting up to twenty pounds occasionally and ten pounds frequently.

The ALJ cites 20 C.F.R. 1527(d) and SSR 96-6p for his decision to give the "light" residual functional capacity assessments made by the non treating, non examining disability determination service examiners substantial weight while giving the opinions of Dr. Langheinrich less weight. (Tr 21) SSRs are opinions, orders, interpretations and statements of policy adopted by SSA. Once published, a ruling is binding on all components of SSA, including ALJs (see Warmoth v. Bowen, 798 F.2d 1109, 1111 n.5 (7th Cir. 1986) (per curiam). SSR 96-6p provides in part:

>(T)he opinions of State agency medical and psychological consultants and other

14

program physicians and psychologists can be given weight only insofar as they are supported by evidence in the case record, considering such factors as the supportability of the opinion in the evidence including any evidence received at the administrative law judge and Appeals Council levels that was not before the State agency, the consistency of the opinion with the record as a whole, including other medical opinions, and any explanation for the opinion provided by the State agency medical or psychological consultant or other program physician or psychologist. The adjudicator must also consider all other factors that could have a bearing on the weight to which an opinion is entitled, including any specialization of the State agency medical or psychological consultant.

20 C.F.R. 1527(d) in turn outlines:

How we weigh medical opinions. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
   (1) Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
   (2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(I) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.
   (I) Length of the treatment relationship and the frequency of examination. Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a

>    longitudinal picture of your impairment, we will give the source's
>    opinion more weight than we would give it if it were from a nontreating
>    source.
>        (ii) Nature and extent of the treatment relationship. Generally, the
>    more knowledge a treating source has about your impairment(s) the more
>    weight we will give to the source's medical opinion. We will look at the
>    treatment the source has provided and at the kinds and extent of
>    examinations and testing the source has performed or ordered from
>    specialists and independent laboratories. For example, if your
>    ophthalmologist notices that you have complained of neck pain during
>    your eye examinations, we will consider his or her opinion with respect
>    to your neck pain, but we will give it less weight than that of another
>    physician who has treated you for the neck pain. When the treating
>    source has reasonable knowledge of your impairment(s), we will give the
>    source's opinion more weight than we would give it if it were from a
>    nontreating source.
>        (3) Supportability. The more a medical source presents relevant
>    evidence to support an opinion, particularly medical signs and
>    laboratory findings, the more weight we will give that opinion. The
>    better an explanation a source provides for an opinion, the more weight
>    we will give that opinion. Furthermore, because nonexamining sources
>    have no examining or treating relationship with you, the weight we will
>    give their opinions will depend on the degree to which they provide supporting
>    explanations for their opinions. We will evaluate the degree to which these
>    opinions consider all of the pertinent evidence in your claim, including opinions
>    of treating and other examining sources.
>        (4) Consistency. Generally, the more consistent an opinion is with
>    the record as a whole, the more weight we will give to that opinion.
>        (5) Specialization. We generally give more weight to the opinion of
>    a specialist about medical issues related to his or her area of
>    specialty than to the opinion of a source who is not a specialist.

As to points 1 and 2, Dr. Langheinrich was obviously an examining and treating physician, who has had a long-standing relationship with the plaintiff. As to point 3, Dr. Langheinrich's opinions are well supported by objective testing, his surgical report, and the opinions of Dr. Desmaris, Dr. Markley and even the consultative physician, Dr. Barbour. The disability determination physicians give virtually no explanation for their "light" assessment. (See Tr 179-186) Further, their two assessments were made on March 23, 2003 and August 25,

16

2003. (Tr 21, 186) The record does not reflect whether they had Dr. Langheinrich's April 22, 2003 letter that stated, "She still has significant chronic myelopathy with spastic paraparesis; however her hand function has improved. She still has significant clonus bilaterally, and she requires baclofen for her spasms" (Tr 195) But it is chronologically obvious they did not have Dr. Langheinrich's September 24, 2003 "To Whom it May Concern" letter that said, "She is completely disabled and unable to work. She has a great difficulty with walking and standing." (Tr 230) Nor could they have had his June 9, 2004 letter stating, "Her lifting restriction is less than ten pounds lifting maximum. I do not feel she is safe working in a standing or walking position." (Tr 229)

As to the fourth criteria, consistency, Dr. Langheinrich's opinion has remained consistent and has consistently been in line with the findings of Dr. Desmaris, Dr. Markley and Dr. Barbour.     Finally, the fifth criterion is specialization. Dr. Langheinrich is a neurosurgeon. Surely it defies common sense to believe that the non examining disability determination physicians are in a better position to assess the lifting limits and walking capacity of a patient with spastic quadripareisis and ataxia than the neurosurgeon who saw the patient before, during and after the surgery.

The plaintiff argues that the only way the ALJ could find her was capable of light work was for him to ignore the evidence, which evidence included:

1. A 2001 abdominal aortogram that showed severe problems with the circulation in her legs; (Tr 91)

2. A post-surgery opinion of spastic lower extremity partial paralysis causing decreased mobility in the activities of daily living by Dr. Desmarais; (Tr 121).

17

3. A report rehabilitation specialist Jon Markley who noted spastic muscle tone in both legs and who gave her a ten-pound lifting restriction; (Tr 158)

4. The objective findings of consultative physician Thomas Barbour who found moderate to severe ataxia, (Tr 175) and who opined that from the cervical problems the plaintiff continues to have a great deal of problems that interfere with daily activity; (Tr 176) and

5. The consistent and oft-repeated opinions of neurosurgeon Walter Langheinrich that the plaintiff had spastic quadriparesis making it difficult for her to stand and walk.

The plaintiff maintains that if these findings had properly been considered a finding of disability would have been mandated because under Rule 201.14 of the Medical Vocational Guidelines found at 20 CFR §. 404, subpt. P, app. 2, a woman over 50 (closely approaching advanced age) who is a high school graduate, whose past relevant work is semi-skilled, but without transferable skills who has a residual functional capacity to only do sedentary work would be found to be disabled.

The plaintiff further argues that the ALJ also erred in his assessment of plaintiff's credibility on the issue of her capacity to work, discounting her testimony that she could not walk for more than one-half block, stand for longer that 5 to 8 minutes or sit for more than 4 to 5 minutes without pain, or bend without losing balance. (Tr 20) He said that while undoubtedly the documented impairments produce symptoms of the general type described, they are inconsistent with her daily activities. (Tr 20) He pointed out that she does household chores including laundry, vacuuming, doing dishes and caring for her personal needs. (Tr 20) She said there are no household chores she does without pain. (Tr 260) Of laundry she said, "It's very hard to get it out of the washer and into the dryer because of the bending over part." (Tr 260) She said she was

18

only able to vacuum for two to three minutes before getting a burning pain. (Tr 260) Regarding dishes she said, "I can't just do dishes like normal. Get them done. I have to constantly stop because of the pain." (Tr 261) She reported getting leg spasms within 10-15 minutes of driving (Tr 263)

In the case of Carradine v. Barnhart, 360 F.3d 751 (7th Cir. 2004) the Court noted the ALJ, "failed to consider the difference between a person's being able to engage in sporadic physical activities and her being able to work eight hours a day five consecutive days per week. Id. at 755 (citations omitted).

Finally, the plaintiff requests that this court review and consider significant substantial evidence. This evidence includes an affirmed dialogue with Dr. Langheinrich in which he outlines why the plaintiff is disabled. Dr. Langheinrich's updated charting has also been presented for review. The affidavits of attorneys Robert Rosenfeld and Steven Parkman were submitted to establish the good faith reason this dialogue was not included. The plaintiff contends that acceptance of this evidence is especially appropriate in light of the regulations found at 20 C.F.R. 404.1512(e)(1) which requires that when an ALJ finds that the evidence submitted by a treating physician is inadequate, he has an affirmative duty to seek clarification or elaboration from the physician. Gossett v. Chater, 947 F.Supp. 1272, 1279 (S.D. Ind. 1996). The plaintiff has now provided the elaboration that she believes the ALJ should have sought if he truly felt that Dr. Langheinrich's opinions were merely conclusory and invaded the Commissioner's domain. The plaintiff has also submitted a report from physical medicine and rehabilitation specialist, Stephen Ribaudo, M.D. supportive of the plaintiff's disability.

When the plaintiff submitted this evidence in a new application for DIB, benefits were

awarded, but only retroactive to the approximate date of the ALJ's decision.  The plaintiff still seeks benefits from the date of disability, July 28, 2002, to the date of the award of benefits, September 3, 2005.

A careful review of the evidence in this case reveals that the plaintiff meets the disability requirements, and met them as of July 28, 2002.  The ALJ in this case improperly ignored evidence showing that the plaintiff was disabled and recited a skewed version of the evidence that he felt showed that the plaintiff could perform light work.  Moreover, the ALJ did not fully consider the plaintiff's testimony but, rather, relied on a few passages taken out of context to support his erroneous determination.  Accordingly, the ALJ's decision will be reversed.

## Conclusion

Based on the foregoing, the decision of the ALJ is hereby REVERSED.  The Commissioner of Social Security Administration is hereby ORDERED to award benefits to the plaintiff, with disability commencing on July 28, 2002.

Entered: June 6, 2007.

s/ William C.  Lee
William C. Lee, Judge
United States District Court

20